**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING**

**DIANA MEY,** individually and on
behalf of a class of persons and
entities similarly situated,

Plaintiff,

v.                                    **CIVIL ACTION NO. 5:14-CV-123
(BAILEY)**

**VENTURE DATA, LLC and
PUBLIC OPINION STRATEGIES**,

Defendants.

## ORDER DENYING PUBLIC OPINION
## STRATEGIES, INC.'S MOTION FOR SUMMARY JUDGMENT

Pending before this Court is Defendant Public Opinion Strategies, Inc.'s Motion for

Summary Judgment [Doc. 121].  The Motion has been fully briefed and is ripe for decision.

For the reasons stated below, the Motion will be denied.

Defendant Public Opinion Strategies, Inc. ("POS") seeks summary judgment in its

favor based on several arguments.  First, POS contends that the plaintiff lacks Article III

standing in that she has failed to allege a cognizable injury.  Second, POS argues that the

plaintiff is a "professional plaintiff" and therefore sustained no injury, thereby depriving her

of standing.  Third, the defendant claims that it did not make the calls in question and is not

vicariously liable for any calls made by defendant Venture Data.  Next, POS contends that

an automatic telephone dialing system ("ATDS") was not used to make the call at issue.

Finally, POS argues that the Telephone Consumer Protection Act ("TCPA") is

unconstitutional as applied to political speech.

1

This civil action was originally filed in this Court on September 9, 2014, asserting a claim under the Telephone Consumer Protection Act, 47 U.S.C. § 227, against defendant Venture Data, LLC only [Doc. 1].  On January 7, 2016, the plaintiff sought and ultimately received leave to file an amended complaint adding POS as a defendant [Docs. 49, 50 & 51].  On February 25, 2016, defendant POS filed its motion to dismiss [Doc. 59].  Briefing on the Motion was completed on March 21, 2016 [Doc. 69].  On April 4, 2016, the  parties stipulated to a stay pending a decision by the United States Supreme Court in *Spokeo, Inc. v. Robins*, No. 13-1339 [Doc. 72].

On May 16, 2016, the Supreme Court issued its decision, *Spokeo, Inc. v. Thomas Robins*, 578 U.S. ___ (2016).  On May 19, 2016, this Court ordered additional briefing on the effect of *Spokeo* [Doc. 76], and by Order entered June 30, 2016, denied a separate motion to dismiss on standing grounds [Doc. 83].

In Defendant Public Opinion Strategies, LLC's Motion to Dismiss Plaintiff's First Amended Complaint [Doc. 59], POS sought dismissal of the vicarious liability [Doc. 60]. That Motion was denied on July 26, 2016 [Doc. 85].

"The TCPA was enacted in response to '[v]oluminous consumer complaints about abuses of telephone technology.' *Mims v. Arrow Financial Services, LLC,* 132 S.Ct. 740, 744 (2012).  In *Mims*, the Supreme Court summarized Congress' findings on the matter:

> In enacting the TCPA, Congress made several findings .... 'Unrestricted telemarketing,' Congress determined, 'can be an intrusive invasion of privacy.'   TCPA, 105 Stat. 2394, note following 47 U.S.C. § 227 (Congressional Findings) (internal quotation marks omitted). In particular,

Congress reported, '[m]any consumers are outraged over the proliferation of intrusive, nuisance [telemarketing] calls to their homes.' *Ibid*. (internal quotation marks omitted). '[A]utomated or prerecorded telephone calls' made to private residences, Congress found, were rightly regarded by recipients as 'an invasion of privacy.' *Ibid*. (internal quotation marks omitted).

*Id*. at 745.

"The unanimous decision in *Mims* also isolated four practices that the TCPA was designed to halt:

[T]he TCPA principally outlaws four practices. First, the Act makes it unlawful to use an automatic telephone dialing system [('autodialer')] or an artificial or prerecorded voice message, without the prior express consent of the called party, to call any ... cellular telephone, or other service for which the receiver is charged for the call. *See* 47 U.S.C. § 227(b)(1)(A). Second, the TCPA forbids using artificial or prerecorded voice messages to call residential telephone lines without prior express consent. § 227(b)(1)(B). Third, the Act proscribes sending unsolicited advertisements to fax machines. § 227(b)(1)(C). Fourth, it bans using automatic telephone dialing systems to engage two or more of a business' telephone lines simultaneously. § 227(b)(1)(D).

*Id*. at 745." *Mey v. Honeywell Intern., Inc.*, 2013 WL 1337295, *1 (S.D. W.Va. March 29, 2013) (Copenhaver, J).

"The TCPA is a remedial statute and thus entitled to a broad construction. *See, e.g.,*

3

*Holmes v. Back Doctors, Ltd.,* 695 F.Supp.2d 843, 854 (S.D. Ill. 2010) ('It is true that ...

the TCPA is a remedial statute.').  As such, it 'should be liberally construed and should be

interpreted (when that is possible) in a manner tending to discourage attempted evasions

by wrongdoers.'  *Scarborough v. Atlantic Coast Line R. Co.,* 178 F.2d 253, 258 (4th Cir.

1950).  At the same time, a remedial purpose 'will not justify reading a provision "more

broadly than its language and the statutory scheme reasonably permit."'  *Touche Ross &*

*Co. v. Redington,* 442 U.S. 560, 578 (1979) (quoting *SEC v. Sloan,* 436 U.S. 103, 116

(1978))."  *Id.  See also In re Monitronics Intern., Inc., Tel. Consumer Protection Act*

*Litigation,* 2015 WL 1964951, *3 (N.D. W.Va. April 30, 2015) (Keeley, J.) (same).

The Court will address the issues raised by POS in the order raised in the POS

Motion:

## I.     The plaintiff has standing.

POS first argues that the plaintiff has failed to plead a particularized injury and

focuses its argument on the allegations of the amended complaint.  This Court has long

since found the allegations of the complaint to be sufficient.  Now that this case is at the

summary judgment stage, the allegations of the complaint are immaterial.  The issue

presently is whether there is sufficient evidence to support the plaintiff's standing.

Under the TCPA, a party is prohibited from making "any call (other than a call made

for emergency purposes or made with the prior express consent of the called party) using

any automatic telephone dialing system or an artificial or prerecorded voice . . . to any

telephone number assigned to a . . . cellular telephone service[.]" 47 U.S.C. §

227(b)(1)(A)(iii).  The TCPA creates a private right of action in which a person may bring

4

"an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater."  47 U.S.C. § 227(b)(3)(B).

Article III, section 2 of the United States Constitution limits the judicial power of federal courts to cases and controversies.  To qualify as a case or controversy, a plaintiff in federal court must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.  ***Spokeo, Inc. v. Robins***, 136 S.Ct. 1540, 1547 (2016).  To establish an injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." ***Id***. at 1548.

In ***Spokeo,*** the Supreme Court addressed the injury-in-fact requirement for Article III standing.  ***Spokeo*** appears to have broken no new ground.  Rather, the Supreme Court confirmed the long-established principle that injury-in-fact is one of three elements required for standing.  ***Id***. at 1547.  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" ***Id***. at 1548.  The Supreme Court held that the Ninth Circuit Court of Appeals had addressed the particularity requirement of injury in fact — the requirement that the injury "must affect the plaintiff in a personal and individual way" — but had overlooked the concreteness requirement, and had therefore failed to determine whether a consumer reporting agency's alleged violations of the Fair Credit Reporting Act's procedural requirements caused concrete injury. ***Id***.

***Spokeo*** confirms that either tangible or intangible injuries can satisfy the

requirement of concreteness. *Id*. at 1549.   Where the injury is intangible, **Spokeo** summarizes two approaches to meet this requirement.   First, courts should consider "whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts. *Id*.  As the Court noted, "the law has long permitted recovery by certain tort victims even if their harms may be difficult to prove or measure.  *See*, e.g., Restatement (First) of Torts §§ 569 (libel), 570 (slander per se) (1938)." *Id*. at 1549.

Second, Congress may "elevat[e] to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law ... ." *Id*. (quoting **Lujan v. Defenders of Wildlife**, 504 U.S. 555, 578 (1992)).  It "has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." *Id*.

The Court also noted that merely asserting a "bare procedural violation, divorced from any concrete harm," will not satisfy the concreteness requirement. *Id*.   This observation has little application to claims under the TCPA, since those claims are not based on "bare procedural" rights, but rather on substantive prohibitions of actions directed toward specific consumers.  Even for procedural rights, however, a "risk of real harm" can satisfy Article III.  *Id*.  The Court stated: "[T]he violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact.  In other words, a plaintiff in such a case need not allege any additional harm beyond the one Congress has identified." *Id*.  The Court offered two examples:

- "'[I]nability to obtain information' that Congress had decided to make public

is a sufficient injury in fact to satisfy Article III ... ."

• "[F]ailure to obtain information subject to disclosure under the Federal Advisory Committee Act 'constitutes a sufficiently distinct injury to provide standing to sue' ... ."

*Id*. at 1549-50.

In ***Spokeo***, the defendant sought a ruling that would have eviscerated causes of action seeking statutory damages. But the Supreme Court did no such thing. Instead, it issued a narrow ruling remanding the case to the Ninth Circuit solely on the basis that it failed to address the extent to which Robins' injuries were "concrete" as opposed to merely particularized, notwithstanding prior Supreme Court precedent requiring a finding of both. *Id*. at 1545. The Supreme Court explicitly took no position on whether Robins' injuries were in fact concrete for standing purposes. *Id*. at 1550.

***Spokeo*** thus created no new law; it merely remanded the case to allow the Ninth Circuit to conduct the proper analysis. As Justice Alito noted, "[w]e have made it clear time and time again that an injury in fact must be both concrete *and* particularized." *Id*. at 1549 (emphasis in original).

This Court finds that unwanted phone calls cause concrete harm. For consumers with prepaid cell phones or limited-minute plans, unwanted calls cause direct, concrete, monetary injury by depleting limited minutes that the consumer has paid for or by causing the consumer to incur charges for calls. In addition, all robocalls deplete a cell phone's battery, and the cost of electricity to recharge the phone is also a tangible harm. While certainly small, the cost is real, and the cumulative effect could be consequential.

Of more import, such calls also cause intangible injuries, regardless of whether the consumer has a prepaid cell phone or a plan with a limited number of minutes.  The main types of intangible harm that unlawful calls cause are (1) invasion of privacy, (2) intrusion upon and occupation of the capacity of the consumer's cell phone, and (3) wasting the consumer's time or causing the risk of personal injury due to interruption and distraction.

One of the ways that *Spokeo* identifies to establish that an intangible injury is concrete is to show that it "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, at 1549.  Invasion of privacy is just such an intangible harm recognized by the common law.  Almost all states recognize invasion of privacy as a common law tort.  *See* Eli A. Meltz, No Harm, No Foul? Attempted Invasion of Privacy and the Tort of Intrusion Upon Seclusion, 83 Fordham L. Rev. 3431, 3440 (May, 2015) (state-by-state survey; "Currently, the vast majority of states recognize the intrusion strand of invasion of privacy either under common law or by statute").

The invasion of privacy claim that is most analogous here is intrusion upon seclusion.  *See Restatement (Second) of Torts* § 652B (1977).  The Fourth Circuit has recognized that the TCPA's prohibitions against robo-calls implicate privacy interests in seclusion.  *Maryland v. Universal Elections, Inc.,* 729 F.3d 370, 377 (4th Cir. 2013).  This tort claim has also often been applied to unwanted telephone calls. *See, e.g.*, *Charvat v. NMP, L.L.C.*, 656 F.3d 440, 452–453 (6th Cir. 2011) (Ohio law) (repeated telemarketing calls, especially after do-not-call request, may be invasion of privacy); *St. Paul Fire & Marine Ins. Co. v. Green Tree Financial Corp.*, 249 F.3d 389 (5th Cir. 2001) (Tex. law).

In essence, the TCPA can be seen as merely liberalizing and codifying the application of this common law tort to a particularly intrusive type of unwanted telephone call.  While the common law tort may require different elements than the TCPA, the Supreme Court's focus in *Spokeo* was not on the elements of the cause of action but rather on whether the harm was of a type that traditionally provides a basis for a common law claim.

It is not only the common law that recognizes as actionable the harm caused by invasion of privacy. The right to privacy is protected under the Constitution. *See, e.g.*, *Lawrence v. Texas*, 539 U.S. 558 (2003); *Eisenstadt v. Baird*, 405 U.S. 438 (1972).  *See also* *Winston v. Lee*, 470 U.S. 753, 758 (1985) (characterizing the Fourth Amendment as protecting expectations of privacy, "the most comprehensive of rights and the right most valued by civilized men").

Even if invasion of privacy were not a harm recognized as redressable through a common law tort claim, it would meet the requirement of concreteness as interpreted by *Spokeo* because Congress so clearly identified it as a legally cognizable harm.  According to the *Spokeo* majority, "because Congress is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important. Thus, we said in *Lujan* that Congress may 'elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.'"  *Spokeo* at 1549.

Protection of consumers' privacy rights was clearly foremost in Congress's mind when it enacted the telephone call restrictions of the TCPA.  The Congressional findings accompanying the TCPA repeatedly stress the purpose of protecting consumers' privacy.

For example:

(5)     Unrestricted telemarketing, however, can be an intrusive invasion of privacy and, when an emergency or medical assistance telephone line is seized, a risk to public safety.

(6)     Many consumers are outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers.

* * * *

(9)     Individuals' privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices.

(10)    Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy.

* * * *

(12)    Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.

(13)    While the evidence presented to the Congress indicates that automated or prerecorded calls are a nuisance and an invasion of privacy, regardless of the type of call, the Federal Communications Commission should have the

10

flexibility to design different rules for those types of automated or prerecorded calls that it finds are not considered a nuisance or invasion of privacy, or for noncommercial calls, consistent with the free speech protections embodied in the First Amendment of the Constitution.

(14)   Businesses also have complained to the Congress and the Federal Communications Commission that automated or prerecorded telephone calls are a nuisance, are an invasion of privacy, and interfere with interstate commerce.

Pub. L. 102–243, § 2, 105 Stat. 2394 (1991) (found as a note to 47 U.S.C. § 227).

As the Act's sponsor, Senator Hollings, emphasized: "Computerized calls are the scourge of modern civilization.  They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall." 137 Cong. Rec. 30,821–30,822 (1991).

Thus, Congress repeatedly identified the intangible harm of invasion of privacy as one of its primary concerns when it enacted the TCPA.  As the Court noted in **Spokeo**, its judgment that this harm is legally cognizable should be given great weight.

A second type of intangible harm suffered by plaintiff by the unwanted calls is intrusion upon and occupation of the capacity of the plaintiff's cell phone.  The harm recognized by the ancient common law claim of trespass to chattels — the intentional dispossession of chattel, or the use of or interference with a chattel that is in the possession of another, is a close analog for a TCPA violation.  *See* Restatement (Second) of Torts § 217 (1965).  As noted in **Spokeo**, the harm can be actionable even if it is "difficult

to prove or measure." *Spokeo* at 1549.

A number of courts have held that temporary electronic intrusion upon another person's computerized electronic equipment constitutes trespass to chattels. *See, e.g.*, *Register.com, Inc. v. Verio, Inc.*, 126 F.Supp.2d 238, 249 (S.D. N.Y. 2000) (intruding electronically into business' database to harvest e-mail addresses, without authorization, causes harm by reducing the system's capacity; "Although Register.com's evidence of any burden or harm to its computer system caused by the successive queries performed by search robots is imprecise, evidence of mere possessory interference is sufficient to demonstrate the quantum of harm necessary to establish a claim for trespass to chattels"), *aff'd,* 356 F.3d 393 (2d Cir. 2004); *America Online, Inc. v. Nat'l Health Care Discount, Inc.*, 121 F.Supp.2d 1255 (N.D. Iowa 2000); *America Online, Inc. v. LCGM, Inc.*, 46 F.Supp.2d 444 (E.D. Va. 1998); *Hotmail Corp. v. Van$ Money Pie, Inc.*, 1998 WL 388389 (N.D. Cal. Apr. 16, 1998); *America Online, Inc. v. IMS*, 24 F.Supp.2d 548 (E.D. Va. 1998) (granting summary judgment against spammer on trespass to chattels and other claims); *CompuServe, Inc. v. CyberPromotions, Inc.*, 962 F.Supp. 1015, 1022 (S.D. Ohio 1997) (issuing preliminary injunction against spammer on theory of trespass to chattels; "A plaintiff can sustain an action for trespass to chattels, as opposed to an action for conversion, without showing a substantial interference with its right to possession of that chattel."); *School of Visual Arts v. Kuprewicz*, 771 N.Y.S.2d 804 (N.Y. Sup. Ct. 2003) (facts alleged constituting elements of trespass to chattels claim). *See also Microsoft Corp. v. Does 1–18*, 2014 WL 1338677, at *9–10 (E.D. Va. Apr. 2, 2014) ("The unauthorized intrusion into an individual's computer system through hacking, malware, or

12

even unwanted communications supports actions under these claims"; use of "botnet" to access computers and servers without authorization states claim for trespass to chattels).

Courts have applied this tort theory to the very actions alleged here — unwanted telephone calls. *Czech v. Wall St. on Demand*, 674 F.Supp.2d 1102, 1122 (D. Minn. 2009) (declining to dismiss cell phone owner's trespass to chattels claim against sender of unwanted text messages); *Amos Financial, L.L.C. v. H&B&T Corp.*, 2015 WL 3953325, at *8 (N.Y. Sup. Ct. June 29, 2015) (occupying memory of answering machine and interfering with unencumbered access to phone would have been trespass to chattels if proven). Even if the consumer does not answer the call or hear the ring tone, the mere invasion of the consumer's electronic device can be considered a trespass to chattels, just as "plac[ing a] foot on another's property" is trespass. *Spokeo*, at 1551 (Thomas, J., concurring).

Thus, the harm caused by unwanted robocalls to cell phones has a close relationship to the harm recognized by this ancient common law tort — a tort that protects fundamental property rights. Indeed, the TCPA can be viewed as merely applying this common law tort to a 21st-century form of personal property and a 21st-century method of intrusion. Applying this ancient tort to these calls and making redress more readily available is particularly appropriate since electronic intrusion is so much easier, and so much more readily repeated, than physical misuse of a chattel.

The Eleventh Circuit has recognized that "the occupation of the recipient's telephone line and fax machine" is a sufficient injury-in-fact for a TCPA claim asserting violations of the statute's junk fax provisions. *Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris,*

***D.D.S., P.A.***, 781 F.3d 1245, 1250–1251 (11th Cir. 2015) (occupation of fax machine for one minute is sufficient, even though there was no evidence that anyone ever printed or saw the faxes).  Several district courts have applied this same reasoning to the occupation of telephone lines and telephones caused by robocalls.  This pre-***Spokeo*** decision is consistent with ***Spokeo*** and supports the finding that this harm is concrete.

A final intangible harm that the illegal calls caused here is that they required the plaintiff to tend to them and wasted the plaintiff's time.  The first post-***Spokeo*** decision to address the TCPA squarely holds that wasting the recipient's time is a concrete injury that satisfies Article III:

> Here, the court is satisfied that plaintiffs' allegations demonstrate "concrete injury" as defined in ***Spokeo***.  In ***Spokeo***, the "injury" plaintiffs incurred was arguably merely procedural and thus non-concrete.  In contrast, the TCPA and [state law] violations alleged here, if proven, required plaintiffs to waste time answering or otherwise addressing widespread robocalls.  The use of the autodialer, which allegedly enabled defendants to make massive amounts of calls at low cost and in a short period of time, amplifies the severity of this injury.  As Congress and Washington State's legislature agreed, such an injury is sufficiently concrete to confer standing.

***Booth v. Appstack, Inc.***, 2016 WL 3030256, *5 (W.D. Wash. May 25, 2016).  *See also* ***Abante Rooter and Plumbing, Inc.***, 2017 WL 733123 (N.D. Cal. February 24, 2017) ("The vast majority of courts that have addressed this question have concluded that the invasion of privacy, annoyance and wasted time associated with robocalls is sufficient to

14

demonstrate concrete injury," citing *Juarez v. Citibank, N.A.*, 2016 WL 4547914 (N.D. Cal. Sept. 1, 2016), *Hewlett v. Consol. World Travel, Inc.*, 2016 WL 4466536 (E.D. Cal. Aug. 23, 2016), *LaVigne v. First Cmty. Bancshares, Inc.*, 2016 WL 6305992 (D. N.M. Oct. 19, 2016), *Mey v. Got Warranty, Inc.*, 193 F.Supp.3d 641 (N.D. W.Va. 2016); *Cour v. LIfe360, Inc.*, 2016 WL 4039279 (N.D. Cal. July 28, 2016), *Rogers v. Capital One Bank*, 2016 WL 3162592 (N.D. Ga. June 3, 2016); *Ung v. Universal Acceptance Corp.*, 198 F.Supp.3d 1036 (D. Minn. 2016), and *Glasser v. Hilton Grand Vacations Co., LLC*, 2017 WL 34823 (M.D. Fla. Jan. 3, 2017).

A number of pre-*Spokeo* decisions have also recognized that lost time is an adequate injury-in-fact in TCPA and other cases.  TCPA cases include *Leung v. XPO Logistics, Inc.*, 2015 WL 10433667, at *4 (N.D. Ill. Dec. 9, 2015) ("Leung alleges that he lost time in responding to XPO's call. … That is enough, so XPO's motion must be denied."); *Martin v. Leading Edge Recovery Solutions., L.L.C.*, 2012 WL 3292838, at *3-4 (N.D. Ill. Aug. 10, 2012) ("[plaintiffs suffered an injury in fact] because they had to spend time tending to unwanted calls").  Courts reach the same conclusion outside the context of the TCPA. *See, e.g.*, *Freedom From Religion Foundation, Inc. v. Obama*, 641 F.3d 803, 807 (7th Cir. 2011) ("What did provide standing, we held, is that the plaintiffs had altered their daily commute, thus incurring costs in both time and money, to avoid the unwelcome religious display."); *Rex v. Chase Home Finance, L.L.C.*, 905 F.Supp.2d 1111 (C.D. Cal. 2012) ("a plaintiff suffers an injury sufficient to establish Article III standing where she alleges that she lost time spent responding to the defendant's wrongful conduct and the lost time is at least indirectly attributable to the defendant's actions.").

15

When it enacted the TCPA, Congress repeatedly emphasized the nuisance aspect of robocalls, showing that it considered the interruptions that they cause and the time they cause consumers to waste to be one of the harms it sought to remedy.  As noted above, Senator Hollings made this clear: "They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed." 137 Cong. Rec. 30,821–30,822 (1991).  Congress was also mindful of protecting consumers from the burdens they face when dealing with unwanted calls.  One of its findings was that "[t]echnologies that might allow consumers to avoid receiving such calls ... place an inordinate burden on the consumer." Pub. L. 102–243, § 2, 105 Stat. 2394 (1991) (found as a note to 47 U.S.C. § 227).  Courts should give weight to Congress's identification of these harms and should determine that they meet the requirement of concreteness.

*Spokeo* also holds that a risk of harm can also be concrete enough to satisfy Article III.  *Spokeo* at 1549.  Unwanted calls meet this standard too, as they cause a risk of injury due to interruption and distraction.  "Driving while distracted" due to a cell phone call is a common cause of automobile accidents: the National Highway Traffic Safety Administration found that cell phone use contributed to 995 fatalities, or 18% of all fatalities, in distraction related crashes in 2009.  NHTSA, *Distracted Driving 2009*, http://www.nrd.nhtsa.dot.gov/Pubs/811379.pdf.

A large number of *pre-Spokeo* cases, applying the principles outlined above, have held that unwanted robocalls cause particularized and concrete harm, so that a plaintiff asserting a TCPA claim has Article III standing. *See, e.g.* **Weisberg v. Kensington Professional and Associates L.L.C.**, 2016 WL 1948785, at *2–3 (C.D. Cal. May 3, 2016)

16

("Plaintiff here does not allege statutory standing, or standing based on the mere alleged violation of a federal statute. Instead, Plaintiff states his theory of actual, individual, concrete injury in the FAC:  Defendant illegally contacted Plaintiff and Class members via their cellular telephones thereby causing Plaintiff and Class members to incur certain charges or reduced telephone time for which Plaintiff and Class members had previously paid by having to retrieve or administer messages left by Defendant during those illegal calls, and invading the privacy of said Plaintiff and Class members. (FAC ¶ 28.) The invasion of privacy and the allegation that the illegal calls cost Plaintiff and the class money-financial harm-are not speculative future injuries or injuries based on the violation of rights provided in a statute. ... [I]n this case, Plaintiff has alleged an invasion of his privacy and monetary damages. These allegations are much more concrete and particularized than those alleged in *Spokeo* and have been accepted as actual injuries in other cases"); *Haysbert v. Navient Solutions, Inc.*, 2016 WL 890297 (C.D. Cal. Mar. 8, 2016) (allegations that calls caused stress and embarrassment and interrupted business and personal interactions are sufficient for Art. III standing); *Abante Rooter and Plumbing, Inc. v. Birch Communications, Inc.*, 2016 WL 269315, at *3 (N.D. Ga. Jan. 7, 2016) (noting Congress's concern that autodialers tie up recipients' telephone lines; "To establish standing, Plaintiff need only allege that its cellular telephone line was occupied by an unsolicited call in violation of the TCPA. ... The invasion of this statutory right established by the TCPA is itself a concrete harm); *Jamison v. Esurance Insurance Services, Inc.,* 2016 WL 320646, at *3 (N.D. Tex. Jan. 27, 2016) ("Here, Jamison alleged that when Esurance violated the TCPA, it caused her to incur cellular telephone charges

17

or to reduce her previously paid-for cellular telephone time, and that it invaded her privacy. Doc. 7, Pl.'s First Am. Compl. ¶ 49.  At this stage, this pleading is sufficient to establish an injury in fact."); *King v. Time Warner Cable,* 113 F.Supp.3d 718 (S.D. N.Y. 2015) ("The legislative history of the TCPA makes clear that the provision against autodialing was drafted to protect 'consumers who pay additional fees for cellular phones, pagers, or unlisted numbers [and] are inconvenienced and even charged for receiving unsolicited calls from automatic dialer systems.' ... In receiving 163 unsolicited calls, Plaintiff clearly experienced the very sort of inconvenience against which Congress sought to protect her. She is entitled to seek compensation for violations of this right, regardless of whether she suffered monetary damages."); *Leung v. XPO Logistics, Inc.*, 2015 WL 10433667, at *4 (N.D. Ill. Dec. 9, 2015); *Schumacher v. Credit Protection Ass'n*, 2015 WL 5786139, at *5 (S.D. Ind. Sept. 30, 2015) ("We agree with CPA that 'Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing,' and that an interest in statutory damages cannot be the sole injury to satisfy Article III requirements, but that is not what has happened here. … Here, Mr. Schumacher's TCPA-created right to privacy was invaded by repeated automated calls from CPA. 'Congress referred to the interest protected by the TCPA as a "privacy" interest, noting that "[e]vidence ... indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy."'"); *Wallace v. Enhanced Recovery Co., L.L.C.*, 2015 WL 5455937, at *5 (E.D. N.C. Sept. 16, 2015) (use of plaintiff's phone for a period of time is sufficient; "Under the TCPA, and as relevant to this case, an

18

injury-in-fact may be established where owner of the telephone number, suing as plaintiff, demonstrates that he or she lost the use of his or her cellular telephone."); ***Ikuseghan v. MultiCare Health System***, 2015 WL 4600818 (W.D. Wash. July 29, 2015) (using up cell phone minutes and invading privacy create Art. III standing); ***Boise v. ACE USA, Inc.***, 2015 WL 4077433, at *3 (S.D. Fla. July 6, 2015) ("Thus, Mr. Boise does not need to 'allege that he wanted to use his phone for another purpose but could not do so.' ... To establish standing, Mr. Boise needs to allege only that his line was occupied by an unsolicited call in violation of the TCPA. The statute presumes that the violation was 'intrusive' and 'potentially dangerous,' and accordingly includes a private right of action to rectify the harm."); ***Meyer v. Bebe Stores, Inc.***, 2015 WL 431148, (N.D. Cal. Feb. 2, 2015) (invasion of privacy sufficient to confer standing even though plaintiff does not allege she incurred any carrier charges for the specific text message at issue); ***Martin v. Leading Edge Recovery Solutions, L.L.C.***, 2012 WL 3292838, at *3 (N.D. Ill. Aug. 10, 2012).

In another post-***Spokeo*** decision, ***Rogers v. Capital One Bank (USA), N.A.***, 2016 WL 3162592 (N.D. Ga. June 7, 2016), the Court found that a violation of the TCPA was a concrete injury, stating:

> Here, the Plaintiffs alleges that the Defendant made unwanted phone calls to their cell phone numbers, in violation of the TCPA.  As the Eleventh Circuit has held, a violation of the TCPA is a concrete injury.  Because the Plaintiffs allege that the calls were made to their personal cell phone numbers, they have suffered particularized injuries because their cell phone lines were unavailable for legitimate use during the unwanted calls.  The Plaintiffs have

alleged sufficient facts to support standing.

*Rogers* at *2, citing *Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1252 (11th Cir. 2015).

For these reasons, this Court finds that the plaintiff has produced sufficient evidence to support her claim of standing in this case.

## II.   Plaintiff's role as a "professional plaintiff" does not deprive her of standing.

POS argues that because the plaintiff acts as a consumer advocate in bringing these actions, she has no injury and lacks standing. POS claims that the plaintiff wanted to receive the calls in question.

Plaintiff Diana Mey is a stay-at-home mom and consumer advocate who lives in Wheeling, West Virginia. POS is a Washington, D.C. market research firm that provides services to political candidates and interest groups. Defendant Venture Data, LLC, is the Utah-based call center that POS uses to place its calls.

It is true that the plaintiff has brought a number of TCPA cases. It is further true that she has telephone answering and recording equipment which is more sophisticated than that of the average consumer. It is not true that she seeks to receive such calls. She does nothing to attract the calls; in fact, her telephone number is listed on the National Do Not Call Registry. Rather, she uses her equipment to record and document TCPA calls when they do occur.

This does not deprive the plaintiff of standing any more than the purchase of a burglar alarm would indicate that the homeowner wanted her house to be broken into.

In support of its argument, POS cites *Stoops v. Wells Fargo Bank, N.A.*, 197

F.Supp.3d 782 (W.D. Pa. 2016).  In *Stoops*, the district court found that the plaintiff did not have standing to sue when she suffered no injury-in-fact.  The plaintiff in *Stoops*, who resided in Pennsylvania, purchased and maintained over thirty cell phones with Florida telephone numbers and admitted to doing this because she knew the locations she selected in Florida were economically depressed and included people who would be defaulting on their loans or their credit cards.  The plaintiff waited for the phones to ring; she sometimes answered the calls and told the callers to stop, but she testified her hope was that the calls would continue so she could treble her damages.  The plaintiff had filed at least eleven TCPA cases in Pennsylvania and sent at least twenty pre-litigation demand letters.  The district court concluded that the plaintiff did not suffer a true nuisance or an invasion of her privacy because the plaintiff admitted that her only purpose in using her cell phones was to file TCPA lawsuits.

On the other hand, in *Fitzhenry v. ADT Corp.*, 2014 WL 6663379, at *5 (S.D. Fla. Nov. 3, 2014), the Court held that "[a]though Plaintiff may have created a home environment that allows him to document telemarketing calls better than most consumers, the Court is not convinced that Plaintiff is outside of the TCPA's zone of interest."

Similarly, in *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948 (7th Cir. 2006), the Court was faced with a plaintiff alleging a violation of the Fair Credit Reporting Act.  In an opinion authored by Judge Easterbrook, the Court noted that the "district judge regarded 'Murray, her spouse, and their children [as] ... professional plaintiffs.  GMAC claims that Murray, her spouse, and their children are participants in more than fifty assorted suits seeking compensation for technical violations of the FCRA which are all being handled by

the same law firm.  Murray does not deny this fact in her reply.  This is ... an indication that Murray and her counsel are merely seeking the 'quick buck' from a class settlement and are not truly interested in vindicating any of the rights of the proposed class members.' Murray tells us that she has filed 'only' nine suits; her husband and four children filed the rest.  Still, the Murrays are in this big time.  What the district judge did not explain, though, is why "professional" is a dirty word.  It implies experience, if not expertise.  The district judge did not cite a single decision supporting the proposition that someone whose rights have been violated by 50 different persons may sue only a subset of the offenders."   434 F.3d at 954.

This Court declines to follow *Stoops*.  This plaintiff did not try to receive calls from other states.  She secured equipment to document calls that came to her home.  While POS is understandably frustrated by Ms. Mey's efficacy, she is doing exactly what Congress intended —enforcing the law.  *See Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc.*, 401 F.3d 876, 881 (8th Cir. 2005) (recognizing that private right of action under TCPA demonstrates Congressional intent to incentivize aggrieved parties to act as "private attorneys general").

This Court finds that Ms. Mey's expertise does not diminish her standing in this case.

### III.   There are genuine issues of material fact as to whether POS is vicariously liable for the calls in question

Fed. R. Civ. P. 56 provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The party seeking summary judgment bears

the initial burden of showing the absence of any genuine issues of material fact.  *See*

***Celotex Corp. v. Catrett***, 477 U.S. 317, 322-23 (1986).  "The burden then shifts to the

nonmoving party to come forward with facts sufficient to create a triable issue of fact."

***Temkin v. Frederick County Comm'rs***, 945 F.2d 716, 718 (4th Cir. 1991), *cert. denied*,

502 U.S. 1095 (1992) (citing ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 247-48

(1986)).

However, as the United States Supreme Court noted in ***Anderson***, "Rule 56(e) itself

provides that a party opposing a properly supported motion for summary judgment may not

rest upon the mere allegations or denials of his pleading, but must set forth specific facts

showing that there is a genuine issue for trial." *Id*. at 256.  "The inquiry performed is the

threshold inquiry of determining whether there is the need for a trial-whether, in other

words, there are any genuine factual issues that properly can be resolved only by a finder

of fact because they may reasonably be resolved in favor of either party." *Id*. at 250; *see*

*also* ***Charbonnages de France v. Smith***, 597 F.2d 406, 414 (4th Cir. 1979) (Summary

judgment "should be granted only in those cases where it is perfectly clear that no issue

of fact is involved and inquiry into the facts is not desirable to clarify the application of the

law." (citing ***Stevens v. Howard D. Johnson Co.***, 181 F.2d 390, 394 (4th Cir. 1950)).  In

reviewing the supported underlying facts, all inferences must be viewed in the light most

favorable to the party opposing the motion. *See* ***Matsushita Elec. Indus. Co. v. Zenith***

***Radio Corp.***, 475 U.S. 574, 587 (1986).  Additionally, the party opposing summary

judgment "must do more than simply show that there is some metaphysical doubt as to the

material facts." *Id*. at 586.  That is, once the movant has met its burden to show absence

of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial.  Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 323-25; *Anderson*, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249 (citations omitted).

POS begins with the proposition: that it avoids liability because it did not physically "initiate" the illegal calls to Ms. Mey.  The FCC has definitively ruled otherwise.  In a seminal 2013 order, the Commission held that even when a defendant does not "initiate" a call, it "may be held vicariously liable under federal common law principles of agency for TCPA violations committed by [a] third-party."  *In the Matter of the Joint Petition Filed by Dish Network, LLC,* 28 F.C.C. Rcd. 6574, 6584 (2013) (the "2013 FCC Ruling").   Such principles include theories of formal agency and ratification. *Id.* at ¶ 28.

"The Hobbs Act, 28 U.S.C. § 2342(1), and the Federal Communications Act, 47 U.S.C. § 402(a), operate together to restrict district courts from invalidating certain actions by the FCC. 28 U.S.C. § 2342 ('The court of appeals ... has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of [ ] all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47.'); *see* **Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.**, 545 U.S. 967, 969 (2005) (holding that, because the FCC is authorized to promulgate binding legal rules and it 'issued the order under review in the exercise of that authority,' the FCC's interpretation of the Communications Act was entitled to *Chevron* deference); **United States v. Mead Corp.**, 533 U.S. 218, 226-27 (2001) (deferring to a federal agency, 'given the "specialized

experience and broader investigations and information" available to the agency, and given the value of uniformity in its administrative and judicial understandings of what a national law requires'); *Penn v. NRA Grp., LLC*, 2014 WL 2986787, at *3 (D. Md. July 1, 2014) ('This Court agrees ... that the district courts have no authority to annul the effect of FCC rulings.') (collecting cases).  Therefore, '[r]egardless of whether this FCC interpretation of the TCPA is entitled to *Chevron* deference, this Court lacks jurisdiction to review its validity.' *Sacco v. Bank of Am., N.A.*, 2012 WL 6566681, at *9 (W.D. N.C. Dec. 17, 2012) (quotations omitted) (referring to a FCC ruling interpreting the 'prior express consent provision' of the TCPA.  Accordingly, the court accepts as valid the 2015 FCC Ruling as a 'final order' for purposes of 28 U.S.C. § 2342(1) because it was the agency's final decision interpreting the 'prior express consent' provision of the TCPA, and it determines legal rights and obligations.  *See Am. Trucking Ass'n, Inc. v. United States*, 755 F.2d 1292, 1296 (7th Cir. 1985); *Sacco*, 2012 WL 6566681, at *9.  However, the matters of interpreting and applying the FCC's rulings remain within the province of the court. *Sacco*, 2012 WL 6566681, at *9 n. 8." *Cartrette v. Time Warner Cable, Inc.*, 157 F.Supp.3d 448, 452-53 (E.D. N.C. 2016)(Flanagan, J.).

POS does not dispute that there can be vicarious liability on the part of a seller under the TCPA, nor could it.  *Smith v. State Farm Mut. Auto Ins. Co.*, 30 F.Supp.3d 765 (N.D. Ill. 2014);  *Kristensen v. Credit Payment Svcs.*, 12 F.Supp.3d 1292 (D.Nev. 2014);  *Mey v. Honeywell Intern., Inc.*, 2013 WL 1337295 (S.D. W.Va. March 29, 2013);  *Cunningham v. Kondaur Capital*, 2014 WL 8335868 (M.D. Tenn. Nov. 19, 2014), report and recommendation approved, 2015 WL 1412737 (M.D. Tenn. Mar. 26, 2015).

"In ***Charvat v. EchoStar Satellite, LLC***, 630 F.3d 459, 468 (6th Cir. 2010), the Sixth Circuit was faced with the issue of whether the TCPA and its accompanying regulations permitted a plaintiff to recover damages under Sections 227(b) and (c) from a defendant that did not place any illegal calls but whose independent contractors did so in attempts to sell the products and services of the defendant.  The Sixth Circuit invoked the doctrine of primary jurisdiction and referred the matter to the Federal Communications Commission ("FCC") to allow the agency to interpret certain provisions of the TCPA and its accompanying regulations.  The FCC issued a declaratory ruling clarifying that, even though a seller may not have initiated or made a call under the TCPA, the seller may nonetheless be vicariously liable under the TCPA based on federal common law principles of agency for violations of Sections 227(b) and (c) that are committed when a third-party telemarketer initiates or places an unlawful call on behalf of the seller.  ***In re Dish Network, LLC***, 28 FCC Rcd. 6574, 2013 WL 1934349 (May 9, 2013)."  ***Cunningham v. Kondaur Capital***, 2014 WL 8335868, at *5 (M.D. Tenn. Nov. 19, 2014), report and recommendation approved, 2015 WL 1412737 (M.D. Tenn. Mar. 26, 2015).

The FCC opined that "a seller cannot avoid liability simply by delegating placing the call to a third-party.  The FCC determined that 'while a seller does not generally "initiate" calls made through a third-party telemarketer within the meaning of the TCPA, it nonetheless may be held vicariously liable under federal common law principles of agency for violations of [ ] section 227(b) ... that are committed by third-party telemarketers.'  *See id*. at 6574.  This includes 'a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification.'  *Id*. at 6584."  ***Hossfeld***

***v. Gov't Employees Ins. Co.***, 88 F.Supp.3d 504, 510 (D. Md. 2015) (Quarles, J.).

The FCC also stated:

> [T]he seller is in the best position to monitor and police TCPA compliance by third-party telemarketers. . . .  We thus agree that, consistent with the statute's consumer protection goals, potential seller liability will give the seller appropriate incentives to ensure that their telemarketers comply with our rules. . . .  By contrast, allowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions.  This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. . . .  Even where third-party telemarketers are identifiable, solvent, and amenable to judgment, limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief.

***Melito v. Am. Eagle Outfitters, Inc.***, 2015 WL 7736547, at *5 (S.D.N.Y. Nov. 30, 2015), quoting 28 FCC Rcd., at 6588.

In denying POS's prior motion to dismiss, this Court recognized the controlling nature of the FCC Ruling and applied it specifically to the claims in this case. [*See* Doc. 85].  First, this Court held that Ms. Mey could establish a formal agency relationship by

proving that POS exerted control over the manner and method of Venture Data's calling activities. [Id. at 9].  Second, the Court held that POS could be liable under a ratification theory if she could prove that "POS was aware of Venture Data's acts and accepted their benefits — regardless of whether POS knew the calls violated the TCPA." [Id. at 11-12].

Courts in this district, and elsewhere, have looked to the Restatement as the source of federal agency principles.  *See, e.g.,* ***In re Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig.***, 2015 WL 1964951, at *9 (N.D. W.Va. April 30, 2015).  *See also,* ***Cmty. for Creative Non-Violence v. Reid***, 490 U.S. 730, 752 n.31 (1989) ("In determining whether a hired party is an employee under the general common law of agency, we have traditionally looked for guidance to the Restatement of Agency."); ***Cilecek v. Inova HealthSys. Servs.***, 115 F.3d 256, 260 (4th Cir. 1997) ("To determine the general common law of agency, the [Supreme] Court notes that it has traditionally looked to sources such as the Restatement of Agency"); ***Doe I v. Unocal Corp.***, 395 F.3d 932, 972 (9th Cir. 2002) ("The general principles of the federal common law of agency have been formulated largely based on the Restatement of Agency."); ***Moriarty v. Glueckert Funeral Home, Ltd.***, 155 F.3d 859, 865 n.15 (7th Cir. 1998) ("In developing the federal law of agency, courts have relied on the Restatement of Agency as a valuable source for those general agency principles.").

According to the Restatement, the "essential element" of an agency relationship is the principal's control over the agent's actions.  Restatement (Third) of Agency, § 1.01 cmt. f.  In the TCPA context, courts have characterized the control necessary to establish agency as being control over "the manner and means" of the agent's calling activities.

*Lushe v. Verengo Inc.*, 2014 WL5794627, at *4 (C.D. Cal. Oct. 22, 2014).  When an agency relationship exists, the scope of the agent's authority may be implied by conduct.  *See* Restatement (Third) of Agency, § 2.02 cmt. c.  The FCC has recognized, for example, that if a principal directs a third-party's calling by providing call lists, the principal can be held responsible forthe third party's calls to those numbers. *See* 2013 FCC Ruling at ¶46 n.138.  Importantly, "the existence and scope of agency relationships are factual matters," typically reserved for a jury. *Metco Products, Div. of Case Mfg. Co. v. N.L.R.B.*, 884 F.2d 156, 159 (4th Cir. 1989).

Discovery in this case has revealed evidence to support Ms. Mey's allegations that POS exerts control over Venture Data's calling operations.  POS determines what numbers Venture Data will dial, and when.  POS pre-determines every word Venture Data interviewers will say.  POS writes code for Venture Data's interviewing software.  Venture Data works with POS to make hiring decisions.  POS knew that Venture Data called cellular telephone lines using equipment capable of predictive dialing.  POS receives daily reports on Venture Data calling activity, and POS managers are in constant contact with Venture Data managers on how to improve performance.  While POS works with a few other call centers, Venture Data is the only other company in which POS has a formal ownership stake.  POS provided the start-up capital without which Venture Data would never have gotten off the ground, and is the source of approximately 80% of Venture Data's revenue.

On an ongoing basis, POS maintains substantial control over Venture Data's calling operations. Examples of POS involvement and control include the following:

• POS provides Venture Data with a list of cellular numbers to call [Doc. 134-3,

82:21-83:21];

• POS writes the scripts for every survey, to which Venture Data's callers must strictly adhere [Id. at 73:7-19];

• POS works with Venture Data programmers to develop customized code for Venture Data's survey software [Id. at 124:23-125:21];

• POS and Venture Data share access to common computer databases, including Venture Data's CATI program and "the Scheduler" [Id.; 132:10-134:3];

• POS and Venture Data work together to ensure Venture Data's call centers are adequately staffed to meet POS's shifting demands [Id. at 115:1-117:2];

• POS sends its new Project Managers to Venture Data's call centers, where they meet with Venture Data's calling teams and even make calls using Venture Data's autodialer [Id. at 101:2-104:18];

• When conducting a survey, POS Project Managers and Venture Data employees are "constantly in touch" and "there is a "consistent kind of all day long back and forth" between them [Id. at 95:10-96:1];

• POS Project Managers work directly with Venture Data to troubleshoot and solve problems with surveys [Id. at 96:20-97:3];

• POS receives and carefully monitors daily reports on Venture Data calling, including specific reports on calls to cellular telephones [Id. at 78:1-79:8];

• POS's Managing Member even receives updates on Venture Data calling operations in the middle of the night [Id. at 106:17-21].

Based on these facts, a jury could conclude that POS exerted control over Venture Data's calling operations sufficient to give rise to an agency relationship, and that the call

to Ms. Mey was well within the scope of Venture Data's authority.  Summary judgment on vicarious liability is therefore unwarranted.

Ms. Mey has also developed evidence sufficient to establish vicarious liability via a ratification theory.   Notably, ratification does not require the existence of an agency relationship. Restatement (Third) of Agency, § 4.01 cmt. b ("Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority.").   It requires only that Ms. Mey prove that "POS was aware of Venture Data's acts and accepted their benefits." [See Order Denying POS Motion to Dismiss, Doc. 85 at 11-12]; see also 2013 FCC Ruling at ¶ 34 & n.103.

It is beyond dispute that POS knew that Venture Data was calling cellular telephone lines. [See, e.g., Doc. 122, Def.'s Br. at 3].  POS knew exactly what equipment Venture Data was using to do so. [Doc. 134-3 at 104:2-18 (stating that POS managers visit Venture Data call centers and make calls using actual Venture Data dialers)].  POS accepted the benefits of Venture Data's calls.  POS's surveys must reach a certain percentage of cellular phone users in order to be statistically representative. [See, e.g., Doc. 134-3 at 72:5-15].  Venture Data's ability to help POS reach a large number of cell phone users is a selling point in POS marketing materials.  See "Telephone Surveys," Public Opinion Strategies (2016), http://pos.org/services/quantitative-research/telephone-surveys/ (last visited Dec. 13, 2016).  Thus, Venture Data's calls to cellular telephones have helped POS become, by its own estimation, "one of the nation's leading public opinion research firms"—a substantial benefit, to be sure. See "Public Opinion Strategies," PUBLIC OPINION STRATEGIES, http://pos.org/ (last visited Dec. 13, 2016).  Furthermore, as a member of Venture Data, LLC, POS receives regular distributions of more than $80,000. [Doc. 134-3 at 56:12-23].

31

Based upon the foregoing, a jury could conclude that POS ratified, and is therefore liable for, Venture Data's conduct.

Finally, vicarious liability for Venture Data's conduct may be found in light of the examples of vicarious liability set forth by the FCC in the 2013 FCC Ruling (the "Dish Network" factors).  In the 2013 Ruling, the FCC provided five "illustrative examples" of evidence establishing vicarious liability.  2013 FCC Ruling at ¶ 46.

The evidence in this case is consistent with four of them.  First, POS provided the scripts used in Venture Data's calls.  Second, there is evidence that Venture Data and POS shared access to information systems like "the Scheduler" and the Venture Data's interviewing program.  Third, Venture Data uploaded Data directly into POS databases. Finally, POS and Venture Data shared voter registration data lists and other information about call recipients.

The only reason the fifth Dish Network example — granting a caller permission to use the principal's name or trademarks — does not apply is because the defendants misrepresent their identities to callers, hiding behind a fictional entity, "Call Research." The Dish Network factors do not support POS's motion for summary judgment.

## IV.   There is an issue of fact as to whether a ATDS was used to make the calls.

Under the TCPA, it is illegal to use an autodialer ("ATDS") to place any call (not just a telemarketing call) to any cellular phone line.  An ATDS is "equipment which has the capacity — (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). According to the FCC, the agency charged with interpreting and administering the TCPA, the prohibition against ATDS also includes "predictive dialers," which do not generate

numbers to be dialed randomly but instead use computer software to automatically dial numbers from a stored list. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961 (2015) (the "2015 Order"). A system qualifies as an ATDS if it has the "capacity" to automatically dial numbers from a stored list, "even if it is not presently used for that purpose." *Id*. at ¶ 10.

Although POS now denies that Venture Data used an ATDS to make calls to Ms. Mey, substantial evidence, including expert testimony and Venture Data's own candid admission, indicates that it did. First, Venture Data has admitted to using an autodialer to call Ms. Mey. In one call, Ms. Mey asked the Venture Data interviewer a straightforward question —"Do you guys use an autodialer to make these calls?" — to which the interviewer provided a straightforward answer: "Yes." In case there was any doubt as to what Ms. Mey meant by the word "autodialer," another Venture Data interviewer clarified: "I did not dial the number. The computer randomly generates the number to call."

Although POS now denies that Venture Data used an ATDS to make the calls to Ms. Mey, a reasonable juror could credit the interviewers' candid admissions over subsequent denials made for the purposes of litigation. This fact alone is sufficient to preclude summary judgment on the ATDS issue.

Even if Venture Data's admissions were not enough, Ms. Mey has also retained an expert witness who is expected to testify that Venture Data's dialing systems have the characteristics of an ATDS. [See Report of Jeffrey Hansen, Doc. 134-5, at ¶ 25].

Venture Data used "Pro-T-S" and "CFMC" dialers to make the calls to Ms. Mey [Doc. 134-2 at 34:7-14]. Expert Jeffrey Hansen will opine that those systems qualify as ATDS

because they are predictive dialers ATDS. [Doc. 134-5 at ¶¶ 17-42].  According to Mr.

Hansen, these dialers are capable of using multiple telephone lines to automatically dial

from a list of numbers loaded into a "campaign" or "pool." [Id. at ¶¶ 25-26].  Mr. Hansen is

expected to further testify that, in contrast to the claims in POS's brief, Venture Data did not

use "two different computer systems" for landline and cellular calls.  Rather, for cellular

calls, Venture Data used the same dialer in so-called "power" mode; a fact that has no

bearing on Mr. Hansen's conclusion because it does not affect the capacity of the system

dialer to dial automatically from a stored list. [Id. at ¶ 31 (citing Doc. 134-2 at 61:16)]. In

fact, Mr. Hansen opines that the fact that Venture Data switched back and forth between

"predictive" and "power" modes in the same day illustrates that the system retains the

capacity for autodialing regardless of the mode selected for a particular set of calls. [Id.

(citing Doc. 134-2 at 63:23-64:5; 71:24-72:8)].

POS argues that Venture Data is not in violation of the TCPA because it used a

Mr. Hansen has provided opinions in hundreds of TCPA cases, and has frequently

acted as a consultant to companies that engage in the lawful use of autodialers. [Doc. 134-

5 at ¶¶ 4-7].  He has years of hands-on experience using and maintaining autodialers in the

calling industry. [Id. at ¶ 8].  Because a reasonable jury could rely on Mr. Hansen's

testimony to conclude that Venture Data used an ATDS system to place calls to cellular

phones on POS's behalf, his report is yet another reason to deny POS's motion for

summary judgment on the ATDS issue.

POS argues that Venture Data is not in violation of the TCPA because it used a

so-called "click-to-call" mode for calls to cellular numbers.  Because "click-to-call" requires

"human intervention," POS contends, it should not qualify as an ATDS, citing ***Pozo v.***

***Stellar Recovery Collection Agency, Inc.***, Case No.: 8:15-cv-929-T-AEP, Dkt. No. 63 at

*6 (M.D. Fla., Sep. 2, 2016) ("Dialing systems which require an agent to manually initiate calls do not qualify as autodialers under the TCPA"); *Wilcox v. Green Tree Servicing, LLC*, 2015 WL 2092671, at *5 (M.D. Fla. May 5, 2015) (granting summary judgment where calls were manually dialed); *Holcombe v. Credit Protection Association, LP*, 44 F. Supp. 3d 1311, 1315 (M.D. Ga. 2015); and *Hunt v. 21st Mortgage Corp.*, 2013 WL 5230061 (N.D. Ala. Sept. 17, 2013).  Defendants also cite the following cases which found that "click to call" functions are not autodialers because human intervention is required:  *Jenkins v. Mgage, LLC*, 2016 WL 4263937, at *1, 7 (N.D. Ga. Aug. 12, 2016); *Carlisle v. Green Tree Servicing, LLC*, 2016 WL 4011238, at *1 (N.D. Ga. July 27, 2016) (granting summary judgment in favor of defendant where evidence showed all calls were manually dialed); *Gaza v. LTD Fin. Services, L.P.*, 2015 WL 5009741, at *1, 4 (M.D. Fla. Aug. 24, 2015) (granting summary judgment in favor of defendant where its agents had to "manually click on the phone number associated with the account to launch the call"); *Modica v. Green Tree Servicing, LLC*, 2015 WL 1943222, at *3 (N.D. Ill. Apr. 29, 2015) (granting summary judgment in favor of defendant where its system required click-to-dial manual intervention); *Gragg v. Orange Cab Co.*, 995 F.Supp.2d 1189, 1193-94 (W.D. Wash. 2014) (granting summary judgment for defendant where calling system required defendant's agent to press "accept" to initiate each call).

POS's focus on whether the particular call to Ms. Mey required human intervention is not dispositive.  As POS itself explains in its brief, "the key feature of an ATDS 'is the capacity to dial numbers without intervention."  [Doc. 122 at 17 (citing In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991, Declaratory Ruling, 23

FCC Rcd. 559, 556 (F.C.C. Jan 4, 2008))].  There is no dispute in this case that both the Pro-T-S and CFMC dialers had the capacity to perform predictive dialing without human intervention. [See Doc. 122 at 19 ("Venture used predictive dialing for landline phones")]. While POS describes "predictive dialing" and "click-to-call" as "different systems," Venture Data used the same physical equipment for both modes. [Doc. 134-2 at 63:23-64:5 (explaining that single dialer can "switch modes" between predictive and click-to-call dialing)].  POS's claim that a dialer would require complex "reprogramming" to go from click-to-call from predictive dialing is contradicted by Venture Data's testimony that its interviewers often switched back-and-forth between the two modes in the course of a single shift.  [Id. at 71:21-72:8].

POS seeks to overcome this problem by arguing that when Congress said "capacity," it really must have meant something narrower, like "present capacity." [Doc. 122 at 18].  Thus, even though Venture Data's dialers had the capacity to act as predictive dialers, POS contends, they should not be considered ATDS because they were not being used in that way for the call at issue.  Unfortunately for POS, the FCC has conclusively foreclosed that argument.  In its most recent order on the subject, the Commission expressly rejected POS's "present capacity" interpretation of the TCPA, holding instead that dialing equipment with the capacity for predictive dialing "meets the TCPA's definition of 'autodialer' even if it is not presently used for that purpose."  2015 FCC Ruling at ¶ 10  In so ruling, the Commission noted that Congress "intended a broad definition of autodialer," and expressed its concern that "a present use or present capacity test could render the TCPA's protections largely meaningless by ensuring that little or no modern dialing equipment would fit the statutory definition of an autodialer." Id. at ¶ 20.

The only cases POS cites in support of its "present capacity" theory were decided prior to the 2015 FCC Ruling.[1] In contrast, numerous courts have applied the 2015 FCC Ruling to reject present capacity arguments.  *See, e.g,, **Dominguez v. Yahoo, Inc.**,* 629 F. App'x 369, 372 (3d Cir. 2015) (holding device is an autodialer if it is part of a system that has the latent capacity to dial randomly or sequentially generated numbers);  ***Cartrette v. Time Warner Cable, Inc.**,* 157 F.Supp.3d 448, 456 (E.D. N.C. 2016) (holding interactive voice response system was autodialer even though it lacked "present capacity" to generate numbers sequentially or randomly); ***Keim v. ADF Midatlantic, LLC***, 2015 WL 11713593, at *5 (S.D. Fla. Nov. 10, 2015) (rejecting human intervention test and applying FCC's broad capacity standard).

As another court recently recognized, FCC orders have a "heightened importance in TCPA cases." *See **Keim***, 2015 WL 11713593, at *2. That is because "the Communications Act of 1934 and the Hobbs Act work together to divest district courts of jurisdiction to question interpretations of the TCPA in FCC orders.  *See, e.g., **Keim***, 2015 WL 11713593, at *2 (citing ***Mais v. Gulf Coast Collection Bureau, Inc.**,* 768 F.3d 1110, 1119–21 (11th Cir. 2014)); ***Nack v. Walburg***, 715 F.3d 680 (8th Cir. 2013).  Thus, even if a district court disagreed with the 2015 FCC Ruling, it would not be free to substitute its own interpretation of the TCPA for that of the Commission.

Accordingly, the 2015 FCC Ruling precludes summary judgment on the ATDS issue.

---

[1]  *See **Gragg v. Orange Cab Co.**,* 995 F.Supp.2d 1189 (W.D. Wash **2014**); ***Hunt v. 21st Mortgage Corp.**,* 2013 WL 5230061 (N.D. Ala. Sept. 17, **2013**).

**V.**     **The TCPA is constitutional in this context**.

POS contends that the TCPA is unconstitutional as applied to political speech as violative of the First Amendment and invites this Court to be the first to say so.  This Court will refuse POS's gracious invitation.

First, it is unclear whether the data which it gathers and sells is political speech.  While the surveys do not convey a political message, the surveys could be considered a part of the "unfettered interchange of ideas."  *See Roth v. United States*, 354 U.S. 476, 484 (1957).  This Court need not determine this issue, since even if the survey taking is, in fact, political speech, the First Amendment provides no protection.

The TCPA is a permissible content-neutral regulation on its face.  "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed."  *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015).  Content-based speech restrictions are subject to strict scrutiny, *id.*, while content-neutral laws like the TCPA are to be narrowly tailored to serve a significant governmental interest and leave open ample alternative channels for communication.  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  A court must "consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys."  *Reed*, 135 S. Ct. at 2227 (quoting *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 544 (2011)); *Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015) (inquiring whether the restriction "makes content distinctions on its face").

Looking to the face of the TCPA restriction at issue, its central provision broadly limits "any person" from using an automatic telephone dialing system or an artificial or

prerecorded voice "to make any call" to a cellular telephone line. 47 U.S.C. § 227(b)(1). The restriction generally applies to all calls with three exceptions: (1) calls "for emergency purposes;" (2) calls made "with the prior express consent of the called party;" and (3) calls made "to collect a debt owed to or guaranteed by the United States." *Id*. Each of these exceptions "are based on the relationship of the speaker and recipient of the message rather than the content of the message." *Patriotic Veterans, Inc. v. State of Indiana*, 177 F.Supp.3d 1120, 1125 (S.D. Ind. 2016). The restriction at issue does not draw distinctions based on the content of the speech or any message expressed.  It does not protect specific categories of speech while prohibiting others.

The Fourth Circuit decision on which POS relies, *Cahaly v. LaRosa*, 796 F.3d 399 (4th Cir. 2015), is easily distinguishable.  The statute at issue in that case prohibited only those robocalls that were "for the purpose of making an unsolicited consumer telephone call" or were "of a political nature including, but not limited to, calls relating to political campaigns." S.C. Code Ann. § 16–17–446(A).  Based on the express language on the face of the South Carolina statute, the Fourth Circuit found that it was content based; the statute made facial content distinctions and thus was subject to strict scrutiny.  *Cahaly*, 796 F.3d at 405.  By contrast, the TCPA does not target, much less mention, political speech or any other type of speech on its face.

Because the TCPA is content-neutral, it is analyzed under the standards applicable to restrictions on the time, place, or manner of engaging in free speech—not "strict scrutiny," as POS would have it.   *See Ward*, 491 U.S. at 791. Under this standard, the TCPA does not run afoul of the First Amendment so long as it is "narrowly tailored to serve

a significant governmental interest" and "leave[s] open ample alternative channels for communication of [ ] information." **McCullen v. Coakley**, 134 S.Ct. 2518, 2529 (2014). Notably, the Fourth Circuit has already applied this standard and upheld a similar provision of the TCPA. *See* **Maryland v. Universal Elections, Inc.**, 729 F.3d 370, 376-77 (4th Cir. 2013).

Applying the proper standard in this case, residential privacy and tranquility have been recognized as significant governmental interests. *See* **id**.; **Frisby v. Schultz**, 487 U.S. 474, 484 (1988). POS does not dispute this. Next, the TCPA's ATDS provision is narrowly tailored to achieve the government's interests. To satisfy this standard, a regulation need not be the least speech-restrictive means of advancing those interests. "Rather, the requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." **Ward**, 491 U.S. at 799 (quotations omitted). Here, the limits on the use of ATDS calls are designed to remedy the problems perceived with the use of ATDS technology. Further, although the use of ATDS technology is limited, the live operator and prior consent options allow the continued use of ATDS technology while protecting the interests of the recipient. To be sure, there must be a "close fit" between ends and means, **McCullen**, 134 S. Ct. at 2534, and such a fit exists here. Further, the TCPA does not "foreclose an entire medium of expression," *see* **City of Ladue v. Gilleo**, 512 U.S. 43, 56 (1994). Rather, it prohibits a single method of communication: autodialed, prerecorded calls to people who have not consented to receive those calls. The restriction is therefore narrowly tailored.

Finally, the TCPA leaves open alternative channels for communication. *See id.* POS has ample other means with which to deliver its message, including live telephone calls, consented to robocalls and mailings. POS is not entitled to its first or best choice or even one that provides the same audience.

Accordingly, for the reasons stated above, Defendant Public Opinion Strategies, Inc.'s Motion for Summary Judgment **[Doc. 121]** is **DENIED**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to counsel of record herein.

**DATED:** March 29, 2017.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE